IN THE UNITED STATES DISTRICT COURT
FOR THE CENTRAL DISTRICT OF ILLINOIS, SPRINGFIELD DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA, ) | |
| ) | |
| Plaintiff, ) | |
| ) | |
| v. ) | No. 09-CR-30041 |
| ) | |
| STEVEN JONES, ) | |
| ) | |
| Defendant. ) | |

## REPORT AND RECOMMENDATION

BYRON G. CUDMORE, U.S. MAGISTRATE JUDGE:

This cause comes before the Court on Defendant Steven Jones' Motion to Suppress Evidence (d/e 13) (Motion to Suppress). The motion is fully briefed, and pursuant to Local Rule 72.1, the District Judge has referred the matter to me for an evidentiary hearing and Report and Recommendation. See Text Order, dated January 20, 2010. After carefully considering the submissions of the parties, hearing evidence on the matter, and pursuant to 28 U.S.C. § 636(b)(1)(B), I recommend that the Motion to Suppress be DENIED.

## I.  BACKGROUND[1]

Defendant Steven Jones is charged in a one-count Indictment (d/e 1) with possession with intent to distribute five or more grams of a substance containing cocaine base (crack) in violation of 21 U.S.C. §§ 841(a)(1) & (b)(1)(B). The case

---

[1] **This Report and Recommendation is prepared without the benefit of a transcript.**

arises out of a traffic stop which occurred September 26, 2008 near the intersection of Interstate 72 and Highway 57 in Adams County, Illinois. The following facts are based upon the testimony presented in open court on March 9, 2010. On September 25, 2008, Inspector Lee Mangold, a detective with the Quincy Police Department assigned to the West Central Illinois Drug Task Force, and Officer Matt McElfresh, also of the West Central Illinois Drug Task Force, met with husband and wife Walter and Janet Thompson.

Both Janet and Walter Thompson were registered confidential informants with the Illinois State Police (ISP) and had also worked as confidential informants for Adams County law enforcement. Inspector Mangold testified that he had signed Janet Thompson up as an ISP confidential informant a few years prior to September 2008. Janet Thompson had participated in controlled narcotics purchases as a confidential source on approximately ten to twelve occasions, although there had been a break in her participation just prior to the activity at issue in the instant case. Walter Thompson had also worked as a confidential informant approximately eight to ten times.

According to Inspector Mangold, Janet Thompson had a substantial criminal history of crimes of dishonesty, and Walter Thompson had a similar criminal history. However, in Mangold's opinion, both Janet and Walter Thompson were reliable informants. Mangold based this opinion on the fact that

the Thompsons had provided accurate, verifiable information in the past and had a high conviction rate in cases in which they were involved.

The September 25, 2008 meeting came about because Mangold contacted Walter Thompson after seeing Walter Thompson leave Defendant Jones' residence. Mangold had information that Jones was distributing cannabis and crack cocaine. Mangold told the Thompsons that law enforcement officials suspected that Walter was participating in a drug conspiracy with Jones by setting up drug deals. Walter admitted that he would bring people to Jones' home to purchase illegal drugs. The Thompsons also told the authorities that both Walter and Janet had traveled to St. Louis with Jones to purchase narcotics and that a trip was planned for Janet in the next couple days, during which half of an ounce of crack would be purchased. According to the Thompsons, the plan was for Jones and Janet to travel to St. Louis in a red Plymouth minivan that was commonly used by Elizabeth Chontal. Mangold was familiar with the minivan and knew that it was a 1999 Plymouth owned by Chontal's father, Greg Mayer. Mangold was also familiar with the van's license plate number.

Law enforcement officials decided to place a tracking device on the red minivan. In the early morning hours of September 26, 2008, Janet Thompson led law enforcement officials to the van, which was parked in or near a public alley at an apartment complex. Later, McElfresh and his supervisor returned to the minivan and placed the tracking device on it. The tracking device was a

transmitter with a magnetic strip which allowed it to be attached to metal on a vehicle. The tracking device worked like a global positioning system and also contemporaneously transmitted its whereabouts to a remote computer. Mangold testified that there was a minimal delay of approximately one or two minutes in the reporting. Government's Ex. 1 is a copy of the tracker report for the minivan in reverse chronological order, beginning at 10:32 a.m. on September 26, 2008.

After placing the tracking device, officers began monitoring the Thompsons' home, having received information that Jones would come to the house to pick up Janet. A little after 3:00 p.m. on September 26, 2008, Mangold saw the red minivan pull up to the Thompsons' home. Jones was driving. Mangold then observed the van heading toward Hannibal, Missouri on Highway 57, with Jones driving and Janet Thompson in the passenger seat. Officials monitored the van's whereabouts through the tracking device, noting that it stopped in Hannibal and then continued south on Highway 61 toward St. Louis.

During the trip, Janet Thompson placed cell phone calls to Walter Thompson, and Walter relayed the information he received from Janet to law enforcement officials.[2] Officials learned that Steven Jones, Jr., Defendant's son, was also in the minivan. Officials further learned that Jones, his son, and Janet

---

[2]**Mangold testified that he had no personal contact with Janet Thompson from the time she left her residence until the traffic stop occurred at approximately 11:00 p.m. He testified that he was not aware that Janet Thompson testified in a prior proceeding that she called Mangold from a gas station bathroom during the trip. Mangold stated that communication was made through Walter Thompson to avoid arousing Jones' suspicion.**

Thompson had picked up Jones' cousin in Hannibal and then continued on to St. Louis where they purchased narcotics from a house on Linton Avenue. Janet Thompson communicated through Walter that the deal was successful and that she was carrying cocaine on her person for the Defendant.

McElfresh was monitoring the tracking device on a computer in his squad car. Officers set up surveillance in Hannibal. During the surveillance, Mangold was in a car with Officer Nick Highland of the Quincy Police Department. At approximately 10:30 p.m., Mangold and Highland spotted the minivan. According to Mangold, the minivan was traveling north on Highway 61, stopped at a gas station in Hannibal, headed north on Highway 61 again, and then proceeded south on Highway 61 to an on ramp for I-72 into Illinois. Mangold followed directly behind the minivan. Mangold testified that the minivan used a turn signal when it got onto I-72.

The van then proceeded from I-72 to Highway 57. Mangold continued to follow it. Both Mangold and Highland testified that they observed that the minivan failed to signal as it exited I-72 onto Highway 57. Mangold testified that he then called McElfresh, who was also following the minivan behind Mangold, and informed him of the traffic violation.

Adams County Deputy Scott Saalborn was stationed in his squad car at milepost 2 on I-72 as a part of the surveillance. Prior to the surveillance, Saalborn, a canine officer, participated in a briefing, during which McElfresh

informed officers that a confidential source was traveling to St. Louis with Defendant to purchase narcotics and they would be returning to Adams County at approximately 11:00 p.m. Saalborn had his trained canine, Brix, with him in his squad car.[3] Saalborn testified that he saw Mangold's vehicle pass his parked squad car, but that the minivan got past Saalborn in the dark. Saalborn pulled out and started to follow the minivan once Mangold passed. McElfresh contacted Saalborn and informed him that the minivan had failed to signal. Saalborn caught up with the minivan and initiated a traffic stop at 11:13 p.m. Saalborn testified that the minivan stopped on Highway 57 just north of the I-72 overpass.

Saalborn testified that he made contact with the driver, Jones, and asked to see his driver's license. According to Saalborn, he then conducted a canine sniff of the minivan with Brix. Saalborn estimated that the sniff occurred approximately three minutes into the traffic stop and that it took approximately thirty seconds. Saalborn testified that he had not returned Jones' license or issued a citation at the time of the sniff.

Jones testified at the evidentiary hearing after being admonished by the Court about the possible consequences of any testimony he might give. Jones presents a slightly different version of the traffic stop. Jones testified that, at the

---

[3] **Defendant stipulated on the record that Brix was adequately trained and reliable.**

**Page 6 of 16**

time he first approached the minivan, Saalborn announced that he was going to issue Jones a warning citation for failure to signal and asked for Jones' driver's license and insurance information. Jones testified that he told Saalborn that he had used his turn signal. According to Jones, after a few minutes, Saalborn returned to the minivan with Jones' driver's license and a warning ticket. Jones testified that Saalborn instructed Jones to sit still and told him that he was going to run the dog around the car.

The parties agree that Brix alerted on the passenger door of the minivan. Saalborn returned Brix to his squad car, got Jones out of the minivan, and conducted a pat down search of Jones, with negative results. Saalborn then opened the passenger door. Janet Thompson exited the minivan and walked back to McElfresh, who had arrived on the scene. Janet Thompson then gave McElfresh the drugs. Saalborn estimated that this occurred six minutes into the stop. Saalborn issued Jones a written warning citation. Government's Ex. 2. Saalborn testified that he did not recall whether he presented Jones with the warning ticket at the scene of the traffic stop or later on at the police station. Saalborn conducted a pat down search of Jones, Jr. and a search of the minivan, both of which had negative results. Jones was transported to the Adams County Sheriff's Office and interviewed by authorities. During the interview, Jones made incriminating statements regarding drug activity.

As previously noted, Jones testified at the evidentiary hearing. Jones explained that he went to St. Louis on September 26, 2008 to purchase drugs from Kevin Vance, who used to be Jones' neighbor. Jones testified that Janet Thompson came to him about going down to St. Louis and that she was initially supposed to put up some money toward the purchase. Jones stated that Janet Thompson was unable to get money from an ATM in St. Louis, so they were not able to purchase as large a quantity of drugs as originally planned. According to Jones, Janet Thompson took possession of the drugs in Vance's house and went into a bathroom to conceal them on her person. From past experience, Jones believed that Janet Thompson placed the drugs in her vagina. Jones also testified that Janet Thompson drove to St. Louis and back from St. Louis until they stopped at the gas station in Hannibal. Jones testified that, during the drive, he and Janet discussed following all traffic laws and Janet reminded him that the area was a "hot spot," i.e., a place where law enforcement officials stop drivers. Jones testified that he used his turn signal when exiting I-72 onto Highway 57.

## II.  ANALYSIS AND CONCLUSIONS OF LAW

Jones filed the pending Motion to Suppress, asking the Court to suppress (1) all physical evidence seized from Jones and the van and (2) all statements, whether written or oral, made by Jones to law enforcement officials at the time of, and subsequent to, his arrest. Jones argues that this evidence was obtained in violation of the Fourth Amendment. Specifically, Jones contends that the

automobile stop constituted an illegal warrantless seizure and that the evidence outlined above should be suppressed because it was derived from the illegal seizure. Defense counsel clarified at the hearing that Jones was not raising any Fifth Amendment challenges, but rather challenged the admissibility of his statements only as fruit of the illegal stop. Jones also expressly withdrew any claim that the traffic stop at issue was unnecessarily prolonged, noting that this claim lacked factual basis. Thus, the Court focuses its analysis on the propriety of the vehicle stop.

The Fourth Amendment to the Constitution guarantees the "right of the people to be secure in their persons, houses, papers and effects, against unreasonable searches and seizures." U.S. Const. amend. IV. A defendant seeking to suppress evidence because of a violation of the Fourth Amendment must first establish that he has standing to challenge the search or seizure in question. United States v. Sweeney, 688 F.2d 1131, 1143 (7th Cir. 1982). Once the defendant has established standing in a case in which law enforcement officers conducted a warrantless search or seizure, the burden of proof shifts to the government, because warrantless searches and seizures are "per se unreasonable under the Fourth Amendment-subject only to a few specifically established and well-delineated exceptions." Katz v. United States, 389 U.S. 347, 357 (1967). At that point, the Government bears the burden of establishing

by a preponderance of the evidence that an exception to the warrant requirement applies. United States v. Basinski, 226 F.3d 829, 833 (7th Cir. 2000).

The Court turns first to the question of standing. As the Court noted on the record, the issue of standing in intertwined with the factual issues in this case. Clearly, Jones has standing to challenge the stop of the minivan which he was driving and the admissibility of his statements to law enforcement officials. The Government argues that Jones lacks standing to challenge the seizure of drugs from Janet Thompson. It is well-established that "'Fourth Amendment rights are personal rights which . . . may not be vicariously asserted.'" United States v. Figueroa-Espana, 511 F.3d 696, 703 (7th Cir. 2007) (quoting United States v. Jackson, 189 F.3d 502, 507 (7th Cir. 1999)). Jones asserts that he has standing to challenge the seizure of narcotics because it flowed from the allegedly unconstitutional automobile stop and thus constitutes fruit of the poisonous tree. See Wong Sun v. United States, 371 U.S. 471 (1963).

As his argument is framed, the Court believes that Jones has standing to challenge the admissibility of the narcotics recovered from Janet Thompson as fruit of the poisonous tree. The exclusionary rule prevents the use of evidence obtained in violation of the Constitution, including the indirect as well as the direct products of the unconstitutional conduct. United States v. Robeles-Ortega, 348 F.3d 679, 681 (7th Cir. 2003) (internal quotations and citations omitted). Courts have recognized that the exclusionary rule can extend to evidence derived from

third parties.  See e.g. United States v. Meece, 580 F.3d 616, 619-20 (7th Cir. 2009) (recognizing the possibility that the fruit of the poisonous tree doctrine could extend to taint consent to search given by defendant's girlfriend following defendant's allegedly unlawful arrest ); United States v. Dallas, 672 F.Supp. 362, 366 (S.D. Ind. 1987) (recognizing the possibility that the fruit of the poisonous tree doctrine could extend to statements made by a third party, but rejecting request to suppress as factually undeveloped).  Jones argues that the disclosure of the drugs resulted from the stop, which he alleges violation of his Constitutional rights; he is not attempting to vicariously assert Janet Thompson's rights.  Thus, the burden of proof shifts to the Government.

The Government bears the burden of establishing by a preponderance of the evidence that an exception to the warrant requirement applies under the facts of the instant case.  It is well-established that, when police officers stop an automobile and detain the occupants briefly, the stop amounts to a seizure within the meaning of the Fourth Amendment and must be reasonable.  See Whren v. United States, 517 U.S. 806, 809-10 (1996).  The Government contends that the stop was supported both by probable cause and reasonable suspicion.  The Court agrees.

   A.  Probable Cause

Where an officer reasonably believes that a driver has committed even a minor traffic offense, probable cause supports a traffic stop.  United States v.

Cashman, 216 F.3d 582, 586 (7th Cir. 2000). The analysis of whether probable cause existed in the instant case requires a credibility determination. Mangold and Highland testified that Jones failed to use his turn signal when exiting I-72 onto Highway 57 in violation of Illinois law. Jones testified that he did use his turn signal. The Court found Mangold and Highland to be particularly credible witnesses and believes that their testimony should be credited over Jones' self-serving statement. Thus, the record supports a finding that Jones committed a traffic violation. Additionally, while Saalborn did not witness the violation, he could rely on the other officers' report of a traffic violation under the collective knowledge doctrine to initiate the traffic stop. See United States v. Sawyer, 224 F.3d 675, 680 (7th Cir. 2000). Finally, the officers' subjective motivation for the traffic stop is irrelevant, where, as here, there is probable cause to justify the seizure. See Whren, 517 U.S. at 812-13. Saalborn's stop of the minivan was supported by probable cause and was not unconstitutional.

Although Jones has withdrawn his argument that the traffic stop was unnecessarily prolonged, the Court notes that the record contains conflicting evidence regarding the point at which Deputy Saalborn conducted a canine sniff of the minivan. According to Jones, Saalborn conducted the canine sniff after he had presented Jones with the written warning citation. Because a seizure that is justified solely by the need to issue a traffic ticket "can become unlawful if it is prolonged beyond the time reasonably required to complete that mission," the

Court briefly addresses the propriety of the canine sniff. Illinois v. Caballes, 543 U.S. 405, 407 (2005). A canine sniff of the exterior of a vehicle for narcotics does not implicate Fourth Amendment concerns, providing that the individual is lawfully detained at the time of the sniff. Id. at 409; see also United States v. Johnson, 2008 WL 187559, at *4 (C.D. Ill. January 18, 2008) ("Adding a dog sniff of the exterior of a vehicle to a lawful traffic stop executed in a reasonable manner does not violate the Fourth Amendment."). In contrast to Jones' testimony outlined above, Saalborn testified that the canine sniff was conducted prior to the issuance of the warning citation and a mere three minutes after the beginning of the traffic stop. The Court finds Saalborn's testimony to be credible. Under the circumstances described by Saalborn, the dog sniff was reasonable and did not violate the Fourth Amendment. The parties agree that Brix alerted on the passenger door. Once a trained dog alerts on a vehicle, officers have probable cause to believe that the vehicle contains contraband. United States v. Ganser, 315 F.3d 839, 844 (7th Cir. 2003). It was permissible for the officers to direct the passengers to exit the vehicle. See Maryland v. Wilson, 519 U.S. 408, 414-15 (1997). At that point, Janet Thompson voluntarily turned the drugs on her person over to McElfresh. There is no evidence of any illegal taint on this voluntary disclosure. See Brown v. Illinois, 422 U.S. 590, 603-04 (1975). Nor is there any other violation that would taint Jones' subsequent statements to authorities. The Motion to Suppress should be denied.

B.  Reasonable Suspicion

The record evidence supports an alternative finding that, even if no traffic violation occurred, reasonable suspicion existed to support an investigative stop of the minivan.  An officer may initiate an investigatory stop of a vehicle, commonly called a <u>Terry</u> stop, when the officer has reasonable suspicion that a crime has occurred or is occurring.  <u>Terry v. Ohio</u>, 392 U.S. 1, 21-22 (1968). "When an officer initiates a <u>Terry</u> stop, he must be able to point to specific and articulable facts that suggest criminality so that he is not basing his actions on a mere hunch. Reasonable suspicion must be evaluated in the totality of the circumstances." <u>United States v. Booker</u>, 579 F.3d 835, 838 (7th Cir. 2009) (internal quotations and citations omitted).

When a <u>Terry</u> stop is based on a tip from an informant, the Court looks to the amount of information given, the degree of reliability, and the extent that the officers can corroborate the informant's information to determine whether the information provided is sufficiently reliable to support reasonable suspicion. <u>Booker</u>, 579 F.3d at 838-39.  In the instant case, the Thompsons provided extensive, detailed information to law enforcement.  The Thompsons informed the police that Jones would be traveling to St. Louis on September 26 with Janet to purchase crack cocaine from Vance at Vance's residence on Linton Avenue and that Jones would be picking Janet up for the trip at the Thompsons' home. The Thompsons informed the police that Jones would be driving Chontal's

minivan, and Thompson led police to the parked minivan.  Significantly, during the course of the return trip from St. Louis, the Thompsons informed the police that the transaction had been successfully completed and that Janet was transporting crack cocaine back to Adams County on her person in the minivan.

The record also supports a finding that the Thompsons were reliable informants.  Both Walter and Janet Thompson had previously cooperated with law enforcement officials on several occasions and had a good conviction rate in cases in which they were involved.  Admittedly, both Walter and Janet Thompson had a criminal history involving crimes of dishonesty.  However, Mangold testified that he did not recall any problems with the Thompsons' past cooperation and did not recall any times at which the Thompsons had provided false information in connection with their cooperation.  Jones has failed to identify any evident to the contrary.

Finally, law enforcement officials were able to corroborate a great deal of the information provided by the Thompsons.  Law enforcement officials observed Jones arrive at the Thompsons' home on the afternoon of September 26, 2008 in Chontal's red minivan to pick up Janet, just as the Thompsons had advised.  Officers received contemporaneous transmissions from the tracking device that were consistent with the information provided by the Thompsons regarding the van's whereabouts.  The information provided by the Thompsons was sufficiently reliable to justify a Terry stop of the minivan.  The officers were not acting on a

mere hunch, but rather on specific and articulable facts that suggested a drug crime was being committed. Thus, even if no traffic violation occurred, the stop of the minivan was not unconstitutional.

Defendant's motion hinges on the argument that the traffic stop was unlawful. However, as set forth above, the seizure was supported both by probable cause and reasonable suspicion; thus, Jones' fruit of the poisonous tree argument necessarily fails. There is no basis for suppression.

### III. CONCLUSION

For all the above reasons, I recommend that Defendant Steven Jones' Motion to Suppress Evidence (d/e 13) be DENIED.

The parties are advised that any objection to this Report and Recommendation must be filed in writing with the Clerk of the Court within 14 days after being served with a copy of this Report and Recommendation. See 28 U.S.C. § 636(b)(1). Failure to file a timely objection will constitute a waiver of objections on appeal. See Video Views, Inc. v. Studio 21, Ltd., 797 F.2d 538, 539 (7th Cir. 1986). See Local Rule 72.2.

ENTER:   March 15, 2010

*s/ Byron G. Cudmore*
_____
BYRON G. CUDMORE
UNITED STATES MAGISTRATE JUDGE